(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## COLEMAN *v.* COURT OF APPEALS OF MARYLAND ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 10–1016. Argued January 11, 2012—Decided March 20, 2012

The Family and Medical Leave Act of 1993 (FMLA) entitles an employee to take up to 12 work weeks of unpaid leave per year for (A) the care of a newborn son or daughter; (B) the adoption or foster-care placement of a child; (C) the care of a spouse, son, daughter, or parent with a serious medical condition; and (D) the employee's own serious health condition when the condition interferes with the employee's ability to perform at work. 29 U. S. C. §2612(a)(1). The FMLA also creates a private right of action for equitable relief and damages "against any employer (including a public agency) in any Federal or State court." §2617(a)(2). For present purposes, subparagraphs (A), (B), and (C) are referred to as the family-care provisions, and subparagraph (D) as the self-care provision. In *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 730−732, this Court held that Congress could subject States to suit for violations of subparagraph (C) based on evidence of family-leave policies that discriminated on the basis of sex.

Petitioner filed suit, alleging that his employer, the Maryland Court of Appeals, an instrumentality of the State, violated the FMLA by denying him self-care leave. The Federal District Court dismissed the suit on sovereign immunity grounds. The Fourth Circuit affirmed, holding that unlike the family-care provision in *Hibbs*, the self-care provision was not directed at an identified pattern of gender-based discrimination and was not congruent and proportional to any pattern of sex-based discrimination on the part of States.

*Held:* The judgment is affirmed.

626 F. 3d 187, affirmed.

JUSTICE KENNEDY, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO, concluded that suits against States under the self-care provision are barred by sovereign immunity. Pp. 3–12.

(a) Under the federal system, States, as sovereigns, are immune from damages suits, unless they waive that defense. *See, e.g., Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 72−73. Congress may also abrogate the States' immunity pursuant to its powers under §5 of the Fourteenth Amendment, but it must make that intention "unmistakably clear in the language of the statute," *Hibbs*, *supra*, at 726. It did so in the FMLA. Congress also "must tailor" legislation enacted under §5 "to remedy or prevent" "conduct transgressing the Fourteenth Amendment's substantive provisions." *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627, 639. "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne* v. *Flores*, 521 U. S. 507, 520. Pp. 3−5.

(b) The sex-based discrimination that supported allowing subparagraph (C) suits against States is absent with respect to the self-care provision. Petitioner's three arguments to the contrary are unpersuasive. Pp. 5–12.

(1) Petitioner maintains that the self-care provision addresses sex discrimination and sex stereotyping. But the provision, standing alone, is not a valid abrogation of the States' immunity from suit. At the time the FMLA was enacted, there was no evidence of such discrimination or stereotyping in sick-leave policies. Congress was concerned about the economic burdens imposed by illness-related job loss on employees and their families and about discrimination based on illness, not sex. Although the self-care provision offers some women a benefit by allowing them to take leave for pregnancy-related illnesses, the provision, as a remedy, is not congruent and proportional to any identified constitutional violations. When the FMLA was enacted, Congress had no evidence that States were excluding pregnancy-related illnesses from their leave policies. Pp. 6–7.

(2) Petitioner also argues that the self-care provision is a necessary adjunct to the family-care provision sustained in *Hibbs*. But his claim—that the provisions work in tandem to ensure the equal availability of total FMLA leave time to women and men despite their different leave-usage patterns—is unconvincing and does not comply with the requirements of *City of Boerne*. Also, there are no congressional findings of, or evidence on, how the self-care provision is necessary to the family-care provisions or how it reduces employer discrimination against women. Pp. 8–11.

(3) Finally, petitioner contends that the self-care provision helps single parents keep their jobs when they get ill. The fact that most

Syllabus

single parents happen to be women demonstrates, at most, that the self-care provision was directed at remedying neutral leave restrictions that have a disparate effect on women. However, "[a]lthough disparate impact may be relevant evidence of . . . discrimination . . . such evidence is insufficient [to prove a constitutional violation] even where the Fourteenth Amendment subjects state action to strict scrutiny." *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 373. Because it is unlikely that many of the neutral leave policies affected by the self-care provision are unconstitutional, the scope of the self-care provision is out of proportion to its supposed remedial or preventive objectives. Pp. 11−12.

   JUSTICE SCALIA adhered to his view that the Court should abandon the "congruence and proportionality" approach in favor of one that is properly tied to the text of §5, which grants Congress the power "to enforce, by appropriate legislation," the other provisions of the Fourteenth Amendment. Outside the context of racial discrimination, Congress's §5 power should be limited to the regulation of conduct that itself violates the Fourteenth Amendment and thus would not reach a State's failure to grant self-care leave to its employees. Pp. 1−2.


   KENNEDY, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and THOMAS and ALITO JJ., joined. THOMAS, J., filed a concurring opinion. SCALIA, J., filed an opinion concurring in the judgment. GINSBURG, J., filed a dissenting opinion, in which BREYER, J., joined, and in which SOTOMAYOR and KAGAN, JJ., joined as to all but footnote 1.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1016

_____

## DANIEL COLEMAN, PETITIONER *v.* COURT OF APPEALS OF MARYLAND ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 20, 2012]

JUSTICE KENNEDY announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO joined.

The question in this case is whether a state employee is allowed to recover damages from the state entity that employs him by invoking one of the provisions of a federal statute that, in express terms, seeks to abrogate the States' immunity from suits for damages. The statute in question is the Family and Medical Leave Act of 1993, 107 Stat. 6, 29 U. S. C. §2601 *et seq.* The provision at issue requires employers, including state employers, to grant unpaid leave for self care for a serious medical condition, provided other statutory requisites are met, particularly requirements that the total amount of annual leave taken under all the Act's provisions does not exceed a stated maximum. §2612(a)(1)(d). In agreement with every Court of Appeals to have addressed this question, this Court now holds that suits against States under this provision are barred by the States' immunity as sovereigns in our federal system. See 626 F. 3d 187 (CA4 2010) (case below); *Nelson* v. *University of Tex.*, 535 F. 3d 318 (CA5 2008);

*Miles* v. *Bellfontaine Habilitation Center*, 481 F. 3d 1106 (CA8 2007) *(per curiam); Toeller* v. *Wisconsin Dept. of Corrections*, 461 F. 3d 871 (CA7 2006); *Touvell* v. *Ohio Dept. of Mental Retardation & Developmental Disabilities*, 422 F. 3d 392 (CA6 2005); *Brockman* v. *Wyoming Dept. of Family Servs.*, 342 F. 3d 1159 (CA10 2003); *Laro* v. *New Hampshire*, 259 F. 3d 1 (CA1 2001).

## I

## A

The Family and Medical Leave Act of 1993 (FMLA or Act) entitles eligible employees to take up to 12 work weeks of unpaid leave per year. An employee may take leave under the FMLA for: (A) "the birth of a son or daughter . . . in order to care for such son or daughter," (B) the adoption or foster-care placement of a child with the employee, (C) the care of a "spouse . . . son, daughter, or parent" with "a serious health condition," and (D) the employee's own serious health condition when the condition interferes with the employee's ability to perform at work. 29 U. S. C. §2612(a)(1). The Act creates a private right of action to seek both equitable relief and money damages "against any employer (including a public agency) in any Federal or State court of competent jurisdiction." §2617(a)(2). As noted, subparagraph (D) is at issue here.

This Court considered subparagraph (C) in *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721 (2003). Subparagraph (C), like (A) and (B), grants leave for reasons related to family care, and those three provisions are referred to here as the family-care provisions. *Hibbs* held that Congress could subject the States to suit for violations of subparagraph (C), §2612(a)(1)(C). That holding rested on evidence that States had family-leave policies that differentiated on the basis of sex and that States administered even neutral family-leave policies in ways

that discriminated on the basis of sex. See *id.,* at 730–732. Subparagraph (D), the self-care provision, was not at issue in *Hibbs*.

## B

Petitioner Daniel Coleman was employed by the Court of Appeals of the State of Maryland. When Coleman requested sick leave, he was informed he would be terminated if he did not resign. Coleman then sued the state court in the United States District Court for the District of Maryland, alleging, *inter alia*, that his employer violated the FMLA by failing to provide him with self-care leave.

The District Court dismissed the suit on the basis that the Maryland Court of Appeals, as an entity of a sovereign State, was immune from the suit for damages. The parties do not dispute the District Court's ruling that the Maryland Court of Appeals is an entity or instrumentality of the State for purposes of sovereign immunity. The District Court concluded the FMLA's self-care provision did not validly abrogate the State's immunity from suit. App. to Pet. for Cert. 15–20. The Court of Appeals for the Fourth Circuit affirmed, reasoning that, unlike the family-care provision at issue in *Hibbs*, the self-care provision was not directed at an identified pattern of gender-based discrimination and was not congruent and proportional to any pattern of sex-based discrimination on the part of States. 626 F. 3d 187. Certiorari was granted. 564 U. S. \_\_\_ (2011).

## II
## A

A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense. See *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 72–73 (2000); *Alden* v. *Maine*, 527 U. S. 706 (1999). As an exception to this

principle, Congress may abrogate the States' immunity from suit pursuant to its powers under §5 of the Fourteenth Amendment. See, *e.g., Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976).

Congress must "mak[e] its intention to abrogate unmistakably clear in the language of the statute." *Hibbs*, 538 U. S., at 726. On this point the Act does express the clear purpose to abrogate the States' immunity. *Ibid.* ("The clarity of Congress' intent" to abrogate the States' immunity from suits for damages under the FMLA "is not fairly debatable"). Congress subjected any "public agency" to suit under the FMLA, 29 U. S. C. §2617(a)(2), and a "public agency" is defined to include both "the government of a State or political subdivision thereof" and "any agency of . . . a State, or a political subdivision of a State," §§203(x), 2611(4)(A)(iii).

The question then becomes whether the self-care provision and its attempt to abrogate the States' immunity are a valid exercise of congressional power under §5 of the Fourteenth Amendment. Section 5 grants Congress the power "to enforce" the substantive guarantees of §1 of the Amendment by "appropriate legislation." The power to enforce "'includes the authority both to remedy and to deter violation[s] of rights guaranteed'" by §1. See *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 365 (2001) (quoting *Kimel*, *supra*, at 81). To ensure Congress' enforcement powers under §5 remain enforcement powers, as envisioned by the ratifiers of the Amendment, rather than powers to redefine the substantive scope of §1, Congress "must tailor" legislation enacted under §5 "'to remedy or prevent'" "conduct transgressing the Fourteenth Amendment's substantive provisions." *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627, 639 (1999).

Whether a congressional Act passed under §5 can impose monetary liability upon States requires an assess-

ment of both the "'evil' or 'wrong' that Congress intended to remedy," *ibid.*, and the means Congress adopted to address that evil, see *City of Boerne* v. *Flores*, 521 U. S. 507, 520 (1997). Legislation enacted under §5 must be targeted at "conduct transgressing the Fourteenth Amendment's substantive provisions." *Florida Prepaid*, *supra,* at 639; see *Kimel*, *supra,* at 88; *City of Boerne*, 521 U. S., at 525. And "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.,* at 520.

Under this analysis *Hibbs* permitted employees to recover damages from States for violations of subparagraph (C). In enacting the FMLA, Congress relied upon evidence of a well-documented pattern of sex-based discrimination in family-leave policies. States had facially discriminatory leave policies that granted longer periods of leave to women than to men. 538 U. S., at 730–731. States also administered facially neutral family-leave policies in gender-biased ways. *Id.,* at 732. These practices reflected what Congress found to be a "pervasive sex-role stereotype that caring for family members is women's work," *id.,* at 731, a stereotype to which even this Court had succumbed in earlier times, *id.,* at 729. Faced with "the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits," *Hibbs* concluded that requiring state employers to give all employees the opportunity to take family-care leave was "narrowly targeted at the faultline between work and family—precisely where sex-based overgeneralization has been and remains strongest." *Id.,* at 735, 738.

## B

The same cannot be said for requiring the States to give all employees the opportunity to take self-care leave. Petitioner advances three arguments for allowing employees to recover damages from States that violate the

FMLA's self-care provision: The self-care provision standing alone addresses sex discrimination and sex stereotyping; the provision is a necessary adjunct to the family-care provision sustained in *Hibbs;* and the provision eases the burden on single parents. But what the family-care provisions have to support them, the self-care provision lacks, namely evidence of a pattern of state constitutional violations accompanied by a remedy drawn in narrow terms to address or prevent those violations.

1

Standing alone, the self-care provision is not a valid abrogation of the States' immunity from suit. When the FMLA was enacted, "ninety-five percent of full-time state- and local-government employees were covered by paid sick leave plans and ninety-six percent of such employees likewise enjoyed short-term disability protection." Brief for States of Texas et al. as *Amici Curiae* 13–14 (hereinafter Texas Brief) (citing Bureau of Labor Statistics, U. S. Dept. of Labor, Employee Benefits in State and Local Governments 17–26 (1994) (hereinafter BLS Rept.)). The evidence did not suggest States had facially discriminatory self-care leave policies or that they administered neutral self-care leave policies in a discriminatory way. And there is scant evidence in the legislative history of a purported stereotype harbored by employers that women take self-care leave more often than men. Congress considered evidence that "men and women are out on medical leave approximately equally." H. R. Rep. No. 101–28, pt. 1, p. 15 (1989) (hereinafter H. R. Rep.). Nothing in the record shows employers formulated self-care leave policies based on a contrary view.

Without widespread evidence of sex discrimination or sex stereotyping in the administration of sick leave, it is apparent that the congressional purpose in enacting the self-care provision is unrelated to these supposed wrongs.

The legislative history of the self-care provision reveals a concern for the economic burdens on the employee and the employee's family resulting from illness-related job loss and a concern for discrimination on the basis of illness, not sex. See, *e.g.,* S. Rep. No. 103–3, pp. 11–12 (1993); H. R. Rep., at 23. In the findings pertinent to the self-care provision, the statute makes no reference to any distinction on the basis of sex. See 29 U. S. C. §2601(a)(4) ("[T]here is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods"). By contrast, with regard to family care Congress invoked concerns related to gender. See §2601(a)(5) ("[D]ue to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men").

It is true the self-care provision offers some women a benefit by allowing them to take leave for pregnancy-related illnesses; but as a remedy, the provision is not congruent and proportional to any identified constitutional violations. At the time of the FMLA's enactment, "ninety-five percent" of state employees had paid sick-leave plans at work, and "ninety-six percent" had short-term disability protection. Texas Brief 13–14 (citing BLS Rept. 17–26). State employees presumably could take leave for pregnancy-related illnesses under these policies, and Congress did not document any pattern of States excluding pregnancy-related illnesses from sick-leave or disability-leave policies. "Congress . . . said nothing about the existence or adequacy of state remedies." *Florida Prepaid*, 527 U. S*.,* at 644. It follows that abrogating the States' immunity from suits for damages for failure to give self-care leave is not a congruent and proportional remedy if the existing state leave policies would have sufficed.

2

As an alternative justification for the self-care provision, it has been suggested that the provision is a necessary adjunct to the family-care provisions. Petitioner argues that employers may assume women are more likely to take family-care leave than men and that the FMLA therefore offers up to 12 weeks of leave for family care and self care combined. According to petitioner, when the self-care provision is coupled with the family-care provisions, the self-care provision could reduce the difference in the expected number of weeks of FMLA leave that different employees take for different reasons.

The fact that self-care leave could have this effect does not mean that it would. If, for example, women are expected to take 20 days of family-care leave per year and men to take 10, and women and men are each expected to take 5 days of self-care leave per year, the difference in the expected number of days of leave and cost to the employer remains the same regardless of the availability of self-care leave. Congress made no findings, and received no specific testimony, to suggest the availability of self-care leave equalizes the expected amount of FMLA leave men and women will take. Even if women take family-care leave more often than men, men do not take self-care leave more often than women; and there is little evidence that employers assume they do. See H. R. Rep., at 15. Petitioner suggests that some women will be expected to take all 12 weeks of leave under the FMLA for family-care purposes, and therefore that any amount of self-care leave taken by men will diminish the difference in the amount of FMLA leave taken by men and women. But there is little evidence to support petitioner's assumption about the magnitude of women's expected FMLA leave for family-care purposes. And men are only expected to take five days of sick leave per year, see *ibid.,* so the self-care provision diminishes the difference in expected leave time by a

maximum of five days. And that is only to the extent women use all their available FMLA leave for family-care reasons. Petitioner's overly complicated argument about how the self-care provision works in tandem with the family-care provisions is unconvincing and in the end does not comply with the clear requirements of *City of Boerne*.

In addition petitioner's first defense of the self-care provision contradicts his second defense of the provision. In the first defense, the Court is told employers assume women take more self-care leave than men. See Tr. of Oral Arg. 10–12. In the second defense, the Court is told the self-care provision provides an incentive to hire women that will counteract the incentives created by the family-care provisions because employers assume women take more family-care leave than men. But if the first defense is correct, the second defense is wrong. In other words, if employers assume women take self-care leave more often than men (the first defense), a self-care provision will not provide an incentive to hire women. To the contrary, the self-care provision would provide an incentive to discriminate against women.

There is "little support in the record for the concerns that supposedly animated" the self-care provision. *Florida Prepaid*, *supra*, at 639. Only supposition and conjecture support the contention that the self-care provision is necessary to make the family-care provisions effective. The evidence documented in support of the self-care provision is, to a large degree, unrelated to sex discrimination, or to the administration of the family-care provisions. See *supra,* at 7. Congress made no findings and did not cite specific or detailed evidence to show how the self-care provision is necessary to the family-care provisions or how it reduces an employer's incentives to discriminate against women. And "Congress . . . said nothing about the existence or adequacy of state" sick-leave policies. *Florida Prepaid*, *supra*, at 644; see *Garrett*, 531 U. S., at 373.

Under this Court's precedents, more is required to sub-ject unconsenting States to suits for damages, particularly where, as here, it is for violations of a provision (the self-care provision) that is a supposedly preventive step in aid of already preventive provisions (the family-care provi-sions).  See *Florida Prepaid*, 527 U. S., at 642 ("[T]he legislative record still provides little support for the prop-osition that Congress sought to remedy a Fourteenth Amendment violation in enacting the Patent Remedy Act"); *Kimel*, 528 U. S., at 88 ("One means by which we have made such a determination . . . is by examining the legislative record containing the reasons for Congress' action").

The "few fleeting references" to how self-care leave is inseparable from family-care leave fall short of what is required for a valid abrogation of States' immunity from suits for damages. *Florida Prepaid*, *supra*, at 644.  These "isolated sentences clipped from floor debates" and testi-mony, *Kimel*, *supra*, at 89, are stated as conclusions, unsupported by evidence or findings about how the self-care provision interrelates to the family-care provisions to counteract employers' incentives to discriminate against women.  Congress must rely on more than abstract gener-alities to subject the States to suits for damages.  Other-wise, Congress could choose to combat the purported effects of the family-care provisions by allowing employees to sue States that do not permit employees to take vaca-tion time under the FMLA.  There is nothing in particular about self-care leave, as opposed to leave for any personal reason, that connects it to gender discrimination.  And when the issue, as here, is whether subparagraph (D) can abrogate a State's immunity from damages, there is no sufficient nexus, or indeed any demonstrated nexus, be-tween self-care leave and gender discrimination by state employers. Documented discrimination against women in the general workplace is a persistent, unfortunate reality,

and, we must assume, a still prevalent wrong. An explicit purpose of the Congress in adopting the FMLA was to improve workplace conditions for women. See 29 U. S. C. §§2601(b)(4), (5). But States may not be subject to suits for damages based on violations of a comprehensive statute unless Congress has identified a specific pattern of constitutional violations by state employers. See *City of Boerne*, 521 U. S., at 532.

3

The petitioner's last defense of the self-care provision is that the provision helps single parents retain their jobs when they become ill. This, however, does not explain how the provision remedies or prevents constitutional violations. The fact that most single parents happen to be women, see, *e.g.,* S. Rep. No. 103–3, at 7, demonstrates, at most, that the self-care provision was directed at remedying employers' neutral leave restrictions which have a disparate effect on women. "Although disparate impact may be relevant evidence of . . . discrimination . . . such evidence alone is insufficient [to prove a constitutional violation] even where the Fourteenth Amendment subjects state action to strict scrutiny." *Garrett, supra,* at 372–373; see *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 82–83 (2001) (O'Connor, J., dissenting); *Washington* v. *Davis*, 426 U. S. 229, 239 (1976). To the extent, then, that the self-care provision addresses neutral leave policies with a disparate impact on women, it is not directed at a pattern of constitutional violations. Because, moreover, it is "unlikely that many of the [neutral leave policies] . . . affected by" the self-care provision are unconstitutional, "the scope of the [self-care provision is] out of proportion to its supposed remedial or preventive objectives." *Kimel, supra,* at 82; see *City of Boerne, supra*, at 519.

Of course, a State need not assert its Eleventh Amendment immunity from suits for damages. See, *e.g., Sossa-*

*mon* v. *Texas*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 5) ("A State . . . may choose to waive its immunity in federal court at its pleasure"). Discrimination against women is contrary to the public policy of the State of Maryland, see, *e.g.,* Maryland's Fair Employment Practices Act, Md. State Govt. Code Ann. §20–606 (Lexis 2009), and the State has conceded that the Act is good social policy, see Tr. of Oral Arg. 35. If the State agrees with petitioner that damages liability for violations of the self-care provision is necessary to combat discrimination against women, the State may waive its immunity or create a parallel state law cause of action.

\*      \*      \*

As a consequence of our constitutional design, money damages are the exception when sovereigns are defendants. See, *e.g., Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 29 (1981). Subjecting States to suits for damages pursuant to §5 requires more than a theory for why abrogating the States' immunity aids in, or advances, a stated congressional purpose. To abrogate the States' immunity from suits for damages under §5, Congress must identify a pattern of constitutional violations and tailor a remedy congruent and proportional to the documented violations. It failed to do so when it allowed employees to sue States for violations of the FMLA's self-care provision. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1016

_____

## DANIEL COLEMAN, PETITIONER *v.* COURT OF APPEALS OF MARYLAND ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 20, 2012]

JUSTICE THOMAS, concurring.

I join the plurality's opinion holding that Congress did not validly abrogate the States' immunity from suit for money damages for violations of the self-care provision of the Family and Medical Leave Act of 1993 (FMLA), 29 U. S. C. §2612(a)(1)(D). As the plurality explains, this case is distinguishable from *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721 (2003), which held that Congress validly abrogated the States' immunity from suit for violations of the FMLA's family-care provision, §2612(a)(1)(C). *Ante,* at 5–6. I write separately only to reiterate my view that *Hibbs* was wrongly decided because the family-care provision is not sufficiently linked to a demonstrated pattern of unconstitutional discrimination by the States. See 538 U. S., at 745–754 (KENNEDY, J., joined by SCALIA and THOMAS, JJ., dissenting); *Tennessee* v. *Lane*, 541 U. S. 509, 565–566 (2004) (THOMAS, J., dissenting). The self-care provision at issue in this case is even further removed from any such pattern.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1016

_____

## DANIEL COLEMAN, PETITIONER *v.* COURT OF APPEALS OF MARYLAND ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 20, 2012]

JUSTICE SCALIA, concurring in the judgment.

The plurality's opinion seems to me a faithful application of our "congruence and proportionality" jurisprudence. So does the opinion of the dissent. That is because the varying outcomes we have arrived at under the "congruence and proportionality" test make no sense. Which in turn is because that flabby test is "a standing invitation to judicial arbitrariness and policy-driven decisionmaking," *Tennessee* v. *Lane*, 541 U. S. 509, 557–558 (2004) (SCALIA, J., dissenting). Moreover, in the process of applying (or seeming to apply) the test, we must scour the legislative record in search of evidence that supports the congressional action. See *ante*, at 6–11; *post*, at 16–20 (opinion of GINSBURG, J.). This grading of Congress's homework is a task we are ill suited to perform and ill advised to undertake.

I adhere to my view that we should instead adopt an approach that is properly tied to the text of §5, which grants Congress the power "to *enforce*, by appropriate legislation," the other provisions of the Fourteenth Amendment. (Emphasis added.) As I have explained in greater detail elsewhere, see *Lane*, *supra*, at 558–560, outside of the context of racial discrimination (which is different for *stare decisis* reasons), I would limit Congress's §5 power to the regulation of conduct that *itself*

violates the Fourteenth Amendment. Failing to grant state employees leave for the purpose of self-care—or any other purpose, for that matter—does not come close.

Accordingly, I would affirm the judgment of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

No. 10–1016

DANIEL COLEMAN, PETITIONER *v.* COURT OF
APPEALS OF MARYLAND ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 20, 2012]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins,
and with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN
join as to all but footnote 1, dissenting.

Section 1 of the Fourteenth Amendment provides: "No
State shall . . . deny to any person within its jurisdiction
the equal protection of the laws." Section 5 grants Con-
gress the "power to enforce, by appropriate legislation, the
provisions of this article." Congress' §5 enforcement power
includes the authority to remedy and deter violations of
§1's substantive guarantees by prohibiting conduct "not
itself forbidden by the Amendment's text." *Kimel* v. *Flor-
ida Bd. of Regents*, 528 U. S. 62, 81 (2000). "In other
words, Congress may enact so-called prophylactic leg-
islation that proscribes facially constitutional conduct,
in order to prevent and deter unconstitutional conduct."
*Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721,
727–728 (2003).

The Family and Medical Leave Act of 1993 (FMLA or
Act) entitles eligible employees to 12 weeks of job-secured
leave during any 12-month period: (A) to care for a new-
born son or daughter; (B) to care for a newly adopted son
or daughter; (C) to care for a spouse, child, or parent with
a serious health condition; or (D) because the employee
has a serious health condition that makes her unable
to perform the functions of her position. 29 U. S. C.

§2612(a)(1).

Even accepting this Court's view of the scope of Congress' power under §5 of the Fourteenth Amendment, I would hold that the self-care provision, §2612(a)(1)(D), validly enforces the right to be free from gender discrimination in the workplace.[1]

I

Section 5 legislation "must be targeted at conduct transgressing the Fourteenth Amendment's substantive provisions," *ante,* at 5 (internal quotation marks omitted), "[a]nd '[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Ibid.* (quoting *City of Boerne* v. *Flores*, 521 U. S. 507, 520 (1997)). The first step of the now-familiar *Boerne* inquiry calls for identification of the constitutional right Congress sought to enforce. See, *e.g., Tennessee* v. *Lane*, 541 U. S. 509, 522 (2004). The FMLA's self-care provision, Maryland asserts, trains not on the right to be free from gender discrimination, but on an "equal protection right to be free from irrational state employment discrimination based on a medical condition." Brief for Respondents 14. The plurality agrees, concluding that the self-care provision reveals "a concern for discrimination on the basis of illness, not sex." *Ante*, at 7. In so declaring, the plurality undervalues the language, pur-

_____

[1] I remain of the view that Congress can abrogate state sovereign immunity pursuant to its Article I Commerce Clause power. See *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 100 (1996) (Souter, J., dissenting). Beyond debate, 29 U. S. C. §2612(a)(1)(D) is valid Commerce Clause legislation. See *infra*, at 21. I also share the view that Congress can abrogate state immunity pursuant to §5 of the Fourteenth Amendment where Congress could reasonably conclude that legislation "constitutes an appropriate way to enforce [a] basic equal protection requirement." *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 377 (2001) (BREYER, J., dissenting) (internal quotation marks omitted).

pose, and history of the FMLA, and the self-care provision's important role in the statutory scheme. As well, the plurality underplays the main theme of our decision in *Hibbs*: "The FMLA aims to protect the right to be free from gender-based discrimination in the workplace." 538 U. S., at 728.

I begin with the text of the statute, which repeatedly emphasizes gender discrimination. One of the FMLA's stated purposes is to "entitle employees to take reasonable leave," 29 U. S. C. §2601(b)(2), "in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis." §2601(b)(4). Another identified aim is "to promote the goal of equal employment opportunity for women and men, pursuant to [the Equal Protection Clause]." §2601(b)(5). "[E]mployment standards that apply to one gender only," Congress expressly found, "have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender." §2601(a)(6).

The FMLA's purpose and legislative history reinforce the conclusion that the FMLA, in its entirety, is directed at sex discrimination. Indeed, the FMLA was originally envisioned as a way to guarantee—without singling out women or pregnancy—that pregnant women would not lose their jobs when they gave birth. The self-care provision achieves that aim.

A brief history is in order. In his 1982 congressional campaign, then-candidate Howard Berman pledged to introduce legislation similar to the California law challenged in *California Fed. Sav. & Loan Assn.* v. *Guerra*, 479 U. S. 272 (1987). S. Wisensale, Family Leave Policy: The Political Economy of Work and Family in America 134

(2001) (hereinafter Wisensale). California's law, enacted in 1978, made it unlawful for an employer to refuse to grant female employees disabled by pregnancy or childbirth up to four months' unpaid, job-protected leave. See 1978 Cal. Stats. ch. 1321, §1, now codified at Cal. Govt. Code Ann. §12945(a)(1) (West Supp. 2012).

The California law sharply divided women's rights advocates. "Equal-treatment" feminists asserted it violated the Pregnancy Discrimination Act's (PDA) commitment to treating pregnancy the same as other disabilities.[2] It did so by requiring leave only for disability caused by pregnancy and childbirth, thereby treating pregnancy as *sui generis*. See Brief for American Civil Liberties Union et al. as *Amici Curiae* in *California Fed.*, O. T. 1985, No. 85–494, pp. 5–10. "Equal-opportunity" feminists disagreed, urging that the California law was consistent with the PDA because it remedied the discriminatory burden that inadequate leave policies placed on a woman's right to procreate. See Brief for Coalition for Reproductive Equality in the Workplace et al. as *Amici Curiae* in *id.,* at 2–6. See also Williams, Equality's Riddle: Pregnancy and the Equal Treatment/Special Treatment Debate, 13 N. Y. U. Rev. L. & Soc. Change 325, 326–328 (1984–1985) (hereinafter Williams) (discussing disagreement).

While *California Fed.* moved through the lower federal courts, equal-treatment feminists began work on a gender-neutral leave model, which eventually became the FMLA.

---

[2] Enacted as an addition to the section defining terms used in Title VII of the Civil Rights Act of 1964, the Pregnancy Discrimination Act of 1978 (PDA) provides: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . ." 92 Stat. 2076, 42 U. S. C. §2000e(k).

See Ross, Legal Aspects of Parental Leave, in Parental Leave and Child Care 97 (J. Hyde & M. Essex eds. 1991) (hereinafter Ross). Then-Congressman Berman met with the Women's Legal Defense Fund's Donna Lenhoff, a drafter of the first FMLA bill. *Id.,* at 114–115, n. 27; Wisensale 136.[3] They agreed that any national bill would focus not only on pregnancy, but on equal treatment for all workers. Ross 114–115, n. 27. See also *Kazmier* v. *Widmann*, 225 F. 3d 519, 547 (CA5 2000) (Dennis, J., dissenting) ("Perceiving that enacting the PDA had not achieved the intended result of preventing discrimination against either women or men in the granting of leave time in that the States felt it necessary to affirmatively grant pregnancy leave to women and not men, in 1985 Congress began considering the issue of family and medical leave.").

Though this Court, in *California Fed.*, eventually upheld California's pregnancy-only leave policy as not preempted by the PDA, equal-treatment feminists continued to believe that viewing pregnancy as *sui generis* perpetuated widespread discrimination against women.[4] They there-

—————

[3] Lenhoff advanced The Parental and Disability Act of 1985, introduced by Rep. Patricia Schroeder. See S. Wisensale, Family Leave Policy: The Political Economy of Work and Family in America 136–138 (2001). She was later named Vice Chair of the Commission on Leave, created by the FMLA to study family and medical leave policies. See 29 U. S. C. §§2631–2632; U. S. Commission on Family and Medical Leave, A Workable Balance: Report to Congress on Family and Medical Leave Policies 210 (Apr. 30, 1996).

[4] For example, in addition to mandating pregnancy leave, the California statute allowed employers to discriminate against pregnant workers. Employers could refuse to select a pregnant woman for a training program if she would not finish the program at least three months before giving birth. See 1978 Cal. Stats. ch. 1321, §1. The law limited pregnancy disability leave to six weeks, §1, and provided that women were to receive paid disability benefits for only three weeks after childbirth, §2, even if a particular woman remained disabled beyond the three-week period, and even if a man received paid disability benefits throughout his disability. Finally, although it prohibited

fore maintained their commitment to gender-neutral leave. See Joint Hearing on H. R. 925 before the Subcommittee on Civil Service and the Subcommittee on Compensation and Employee Benefits of the House Committee on Post Office and Civil Service, 100th Cong., 1st Sess., 36 (1987) (hereinafter 1987 House Hearing) (statement of Prof. Eleanor Holmes Norton, Georgetown University Law Center) ("[If *California Fed.*] becomes the model, employers will provide something for women affected by pregnancy that they are not required to provide for other employees. This gives fodder to those who seek to discriminate against women in employment. . . . In the *[California Fed.]* case, I would have preferred the interpretation urged by the [equal-treatment feminists].").

Congress agreed. See *infra*, at 14–15. Adhering to equal-treatment feminists' aim, the self-care provision, 29 U. S. C. §2612(a)(1)(D), prescribes comprehensive leave for women disabled during pregnancy or while recuperating from childbirth—without singling out pregnancy or childbirth. See S. Rep. No. 101–77, p. 32 (1989) (A "significant benefit of the temporary medical leave provided by this legislation is the form of protection it offers women workers who bear children. Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy-related disability. Legislation solely protecting

_____

employers from refusing to *promote* a woman because of pregnancy, it did not forbid refusing to *hire* a woman on that basis. See §1. See also Brief for National Organization for Women et al. as *Amici Curiae* in *California Fed. Sav. & Loan Assn.* v. *Guerra*, O. T. 1985, No. 85–494, pp. 14–15. These provisions were all expressly made inapplicable to employers covered by Title VII, "[i]n the event Congress enacts legislation amending Title VII . . . to prohibit sex discrimination on the basis of pregnancy," namely, the PDA. See 1978 Cal. Stats. ch. 1321, §4.

pregnant women gives employers an economic incentive to discriminate against women in hiring policies; legislation helping all workers equally does not have this effect."). In view of this history, it is impossible to conclude that "nothing in particular about self-care leave . . . connects it to gender discrimination." *Ante,* at 10.

## II

### A

*Boerne* next asks "whether Congress had evidence of a pattern of constitutional violations on the part of the States." *Hibbs,* 538 U. S., at 729. See also *Boerne,* 521 U. S., at 530–532. Beyond question, Congress had evidence of a well-documented pattern of workplace discrimination against pregnant women. Section 2612(a)(1)(D) can therefore "be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.,* at 532.

Although the PDA proscribed blatant discrimination on the basis of pregnancy, see 42 U. S. C. §§2000e(k), 2000e–2, *supra,* at 4, n. 2, the Act is fairly described as a necessary, but not a sufficient measure. FMLA hearings conducted between 1986 and 1993 included illustrative testimony from women fired after becoming pregnant or giving birth. For example, Beverly Wilkenson was granted seven weeks of leave upon the birth of her child. On the eve of her return to work, a superior informed her that her job had been eliminated. He stated: "Beverly, the best thing for you to do is stay home and take care of your baby and collect your unemployment." Hearing on H. R. 770 before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 101st Cong., 1st Sess., 12 (1989) (hereinafter 1989 House Hearing) (statement of Beverly Wilkenson). See also S. Rep. No. 102–68, p. 27 (1991) (hereinafter 1991 Senate Report) (describing Ms. Wilkenson's testimony). Similarly, Linda Pillsbury was notified that she no longer had a job three

weeks after her daughter was born.[5]  Three secretaries at the same workplace were also forced out of their jobs when they returned to work within weeks of giving birth.  See Hearings on S. 249 before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 100th Cong., 1st Sess., pt. 2, pp. 16, 23 (1987) (hereinafter 1987 Senate Hearings) (statement of Linda Pillsbury).

These women's experiences, Congress learned, were hardly isolated incidents.  A spokeswoman for the Mayor's Commission on Women's Affairs in Chicago testified: "The lack of uniform parental and medical leave policies in the workplace has created an environment where discrimination is rampant.  Very often we are contacted by women workers who are at risk of losing their jobs or have lost them because they are pregnant, [or have] given birth." *Id.*, at 170 (statement of Peggy Montes).  See also Joint Hearing on The Parental and Medical Leave Act of 1986 before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong., 2d Sess., 110, n. 18 (1986) (hereinafter 1986 House Hearing) (statement of Women's Legal Defense Fund) ("[W]omen who are temporarily unable to work due to pregnancy, child-birth, and related medical conditions such as morning sickness, threatened miscarriage, or complications arising from childbirth, often lose their jobs because of the inadequacy of their employers' leave policies."); 1991 Senate Report 28 (recording that an Atlanta-based job counseling hotline received approximately 100 calls each year from women who were fired, harassed, or forced out of their jobs due to pregnancy or maternity-disability

––––––––

[5]The medical recovery period for a normal childbirth is four to eight weeks.  See *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 731, n. 4 (2003).

leave); 139 Cong. Rec. 1826 (1993) (remarks of Sen. Edward Kennedy) ("[W]omen who are pregnant are discriminated against as a general rule in our society and have difficulty retaining their jobs."). As summarized by the American Bar Association:

> "Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women's roles has in turn justified discrimination against women when they are mothers or mothers-to-be." 1989 House Hearing 248 (American Bar Association Background Report). See also *Hibbs*, 538 U. S., at 736 (quoting same language).

"Many pregnant women have been fired when their employer refused to provide an adequate leave of absence," Congress had ample cause to conclude. See H. R. Rep. No. 99–699, pt. 2, p. 22 (1986). Pregnancy, Congress also found, has a marked impact on women's earnings. One year after childbirth, mothers' earnings fell to $1.40 per hour less than those of women who had not given birth. See 1991 Senate Report 28. See also 1989 House Hearing 356–357 (Report of 9to5, National Association of Working Women (citing same study)).

Congress heard evidence tying this pattern of discrimination to the States. A 50-state survey by the Yale Bush Center Infant Care Leave Project concluded that "[t]he proportion and construction of leave policies available to public sector employees differs little from those offered private sector employees." *Hibbs*, 538 U. S., at 730, n. 3 (quoting 1986 House Hearing 33 (statement of Meryl Frank)). Roughly 28% of women employed in the public sector did not receive eight weeks of job-protected medical leave to recover from childbirth. See 1987 Senate Hearings, pt. 1, pp. 31, 35, 39 (statement of James T. Bond,

National Counsel of Jewish Women). A South Carolina state legislator testified: "[I]n South Carolina, as well as in other states . . . no unemployment compensation is paid to a woman who is necessarily absent from her place of employment because of pregnancy or maternity." See *id.,* pt. 2, p. 361 (statement of Rep. Irene Rudnick). According to an employee of the State of Georgia, if state employees took leave, it was held against them when they were considered for promotions: "It is common practice for my Department to compare the balance sheets of workers who have and have not used [leave] benefits in determining who should and should not be promoted." Hearing on H. R. 2 before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 102d Cong., 1st Sess., 36 (1991) (statement of Robert E. Dawkins). See also *id.,* at 33 (One type of leave for Georgia state employees "boils down to whether your supervisor wants you to come back or not."). In short, Congress had every reason to believe that a pattern of workplace discrimination against pregnant women existed in public-sector employment, just as it did in the private sector.

### B

"[A] state's refusal to provide pregnancy leave to its employees," Maryland responds, is "not unconstitutional." Brief for Respondents 23 (citing *Geduldig* v. *Aiello*, 417 U. S. 484, 495 (1974)). *Aiello*'s footnote 20 proclaimed that discrimination on the basis of pregnancy is not discrimination on the basis of sex. In my view, this case is a fit occasion to revisit that conclusion. Footnote 20 reads:

> "The dissenting opinion to the contrary, this case is . . . a far cry from cases like *Reed* v. *Reed*, 404 U. S. 71 (1971), and *Frontiero* v. *Richardson*, 411 U. S. 677 (1973), involving discrimination based upon gender as such. The California insurance program does not

exclude anyone from benefit eligibility because of gender but merely removes one physical condition—pregnancy—from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . .

"The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes." 417 U. S., at 496, n. 20.

First, "[a]s an abstract statement," it is "simply false" that "a classification based on pregnancy is gender-neutral." *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 327 (1993) (Stevens, J., dissenting). Rather, discriminating on the basis of pregnancy "[b]y definition . . . discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male." *General Elec. Co.* v. *Gilbert*, 429 U. S. 125, 161–162 (1976) (Stevens, J., dissenting). See also Issacharoff & Rosenblum, Women and the Workplace: Accommodating the Demands of Pregnancy, 94 Colum. L. Rev. 2154, 2180 (1994) ("[I]t is precisely because pregnancy is a condition unique to women that the exclusion of pregnancy from disability coverage is a sex-based classification . . . .").

This reality is well illustrated by the facts of *Aiello*. The California disability-insurance program at issue granted disability benefits for virtually any conceivable work disability, including those arising from cosmetic surgery,

skiing accidents, and alcoholism. See Brief for EEOC as *Amicus Curiae* in *Aiello*, O. T. 1973, No. 73–640, p. 7. It also compensated men for disabilities caused by ailments and procedures that affected men alone: for example, vasectomies, circumcision, and prostatectomies. See Brief for American Civil Liberties Union et al. as *Amici Curiae* in *id.,* at 17–18. Only pregnancy was excluded from the definition of disability. See Cal. Un. Ins. Code Ann. §2626 (West 1972); *Aiello*, 417 U. S., at 489. As Justice Brennan insightfully concluded in dissent, "a limitation is imposed upon the disabilities for which women workers may re-cover, while men receive full compensation for all disabili-ties suffered . . . . Such dissimilar treatment of men and women, on the basis of physical characteristics inextricably linked to one sex, inevitably constitutes sex discrimina-tion." *Id.,* at 501.

Second, pregnancy provided a central justification for the historic discrimination against women this Court chronicled in *Hibbs*. See 538 U. S., at 729 ("[A] proper discharge of [a woman's] maternal functions—having in view not merely her own health, but the well-being of the race—justif[ies] legislation to protect her from the greed as well as the passion of man." (quoting *Muller* v. *Oregon*, 208 U. S. 412, 422 (1908); 2d and 3d alterations in *Hibbs*)). See also Siegel, Employment Equality Under the Preg-nancy Discrimination Act of 1978, 94 Yale L. J. 929, 942 (1985) (Pregnancy "is a biological difference central to the definition of gender roles, one traditionally believed to render women unfit for employment."). Relatedly, dis-crimination against pregnant employees was often "based not on the pregnancy itself but on predictions concerning the future behavior of the pregnant woman when her child was born or on views about what her behavior should be." Williams 355. See also S. Rep. No. 95–331, p. 3 (1977) ("[T]he assumption that women will become pregnant and leave the labor market is at the core of the sex stereotyp-

ing resulting in unfavorable disparate treatment of women in the workplace.").

In sum, childbearing is not only a biological function unique to women. It is also inextricably intertwined with employers' "stereotypical views about women's commitment to work and their value as employees." *Hibbs,* 538 U. S., at 736. Because pregnancy discrimination is inevitably sex discrimination, and because discrimination against women is tightly interwoven with society's beliefs about pregnancy and motherhood, I would hold that *Aiello* was egregiously wrong to declare that discrimination on the basis of pregnancy is not discrimination on the basis of sex.

C

*Boerne's* third step requires "'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Ante,* at 5 (quoting 521 U. S., at 520). Section 2612(a)(1)(D), I would conclude, is an appropriate response to pervasive discriminatory treatment of pregnant women. In separating self-care leave for the physical disability following childbirth, §2612(a)(1)(D), which affects only women, from family-care leave for parenting a newborn baby, §2612(a)(1)(A), for which men and women are equally suited, Congress could attack gender discrimination and challenge stereotypes of women as lone childrearers. Cf. *Hibbs*, 538 U. S., at 731 (States' extended "maternity" leaves, far exceeding a woman's physical disability following childbirth, were attributable "to the pervasive sex-role stereotype that caring for family members is women's work.").

It would make scant sense to provide job-protected leave for a woman to care for a newborn, but not for her recovery from delivery, a miscarriage, or the birth of a stillborn baby. And allowing States to provide no pregnancy-disability leave at all, given that only women can become

pregnant, would obviously "exclude far more women than men from the workplace." *Id.,* at 738.

The plurality's statement that Congress lacked "widespread evidence of sex discrimination . . . in the administration of sick leave," *ante,* at 6, misses the point. So too does the plurality's observation that state employees likely "could take leave for pregnancy-related illnesses"— presumably severe morning sickness, toxemia, etc.—under paid sick-leave plans, *ante,* at 7. Congress heard evidence that existing sick-leave plans were inadequate to ensure that women were not fired when they needed to take time out to recover their strength and stamina after childbirth. The self-care provision responds to that evidence by requiring employers to allow leave for "ongoing pregnancy, miscarriages, . . . the need for prenatal care, childbirth, and recovery from childbirth." S. Rep. No. 103–3, p. 29 (1993).

That §2612(a)(1)(D) entitles all employees to up to 12 weeks of unpaid, job-protected leave for a serious health condition, rather than singling out pregnancy or childbirth, does not mean that the provision lacks the requisite congruence and proportionality to the identified constitutional violations. As earlier noted, *supra,* at 6–7, Congress made plain its rationale for the prescription's broader compass: Congress sought to ward off the unconstitutional discrimination it believed would attend a pregnancy-only leave requirement. Under the caption "Equal protection and non-discrimination," Congress explained:

> "The FMLA addresses the basic leave needs of all employees. . . . This is an important principle reflected in the bill.
> "A law providing special protection to women . . . , in addition to being inequitable, runs the risk of causing discriminatory treatment. Employers might be less inclined to hire women . . . . For example, legisla-

tion addressing the needs of pregnant women only might encourage discriminatory hiring practices against women of child bearing age. Legislation addressing the needs of all workers equally does not have this effect. By addressing the serious leave needs of all employees, the FMLA avoids providing employers the temptation to discriminate [against women].

.          .          .          .          .

"The legislation is [thus] based not only on the Commerce Clause, but also on the guarantees of equal protection . . . embodied in the Fourteenth Amendment." H. R. Rep. No. 102–135, pt. 1, pp. 27–28 (1991) (hereinafter 1991 House Report).

Congress' concern was solidly grounded in workplace realities. After this Court upheld California's pregnancy-only leave policy in *California Fed.*, Don Butler, President of the Merchants and Manufacturers Association, one of the plaintiffs in that case, told National Public Radio reporter Nina Totenberg that, as a result of the decision, "many employers will be prone to discriminate against women in hiring and hire males instead." 1987 House Hearing 36. Totenberg replied, "But that is illegal, too"— to which Butler responded, "Well, that is illegal, but try to prove it." *Ibid.*

Finally, as in *Hibbs*, it is important to note the moderate cast of the FMLA, in particular, the considerable limitations Congress placed on §§2612(a)(1)(A)–(D)'s leave requirement. See 538 U. S., at 738–739. FMLA leave is unpaid. It is limited to employees who have worked at least one year for the employer and at least 1,250 hours during the past year. §§2611(2)(A), 2612(c)(1). High-ranking employees, including state elected officials and their staffs, are not within the Act's compass. §§203(e)(2)(C), 2611(3). Employees must provide advance notice of foreseeable leaves. §2612(e). Employers may

require a doctor's certification of a serious health condition. §2613(a). And, if an employer violates the FMLA, the employees' recoverable damages are "strictly defined and measured by actual monetary losses." *Hibbs*, 538 U. S., at 740 (citing §§2617(a)(1)(A)(i)–(iii)). The self-care provision, I would therefore hold, is congruent and proportional to the injury to be prevented.

## III

But even if *Aiello* senselessly holds sway, and impedes the conclusion that §2612(a)(1)(D) is an appropriate response to the States' unconstitutional discrimination against pregnant women,[6] I would nevertheless conclude that the FMLA is valid §5 legislation. For it is a meet response to "the States' record of unconstitutional partici-

--------

[6] Notably, the plurality does not cite or discuss *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), perhaps embarrassed by that opinion's widely criticized conclusion that discrimination based on pregnancy does not involve "discrimination based upon gender as such," *id.,* at 496, n. 20. See *supra,* at 10–13; E. Chemerinsky, Constitutional Law 759 (3d ed. 2006) ("It is hard to imagine a clearer sex-based distinction" than the one at issue in *Aiello*); Kay, Equality and Difference: The Case of Pregnancy, 1 Berkeley Women's L. J. 1, 31 (1985) ("*[Aiello]* results in unequal treatment of similarly situated women and men who have engaged respectively in reproductive conduct [and wish to continue working]. It should be overruled."); Law, Rethinking Sex and the Constitution, 132 U. Pa. L. Rev. 955, 983–984 (1984) ("Criticizing *[Aiello]* has . . . become a cottage industry. Over two dozen law review articles have condemned both the Court's approach and the result. . . . Even the principal scholarly defense of *[Aiello]* admits that the Court was wrong in refusing to recognize that the classification was sex-based . . . ."); Karst, The Supreme Court 1976 Term Foreword: Equal Citizenship under the Fourteenth Amendment, 91 Harv. L. Rev. 1, 54, n. 304 (1977) ("[T]he constitutional sport of *[Aiello]* and last Term's even sillier statutory counterpart, *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), with their Alice-in-Wonderland view of pregnancy as a sex-neutral phenomenon, are good candidates for early retirement. These decisions are textbook examples of the effects of underrepresentation on "legislative" insensitivity. Imagine what the presence of even one woman Justice would have meant to the Court's conferences.").

pation in, and fostering of, gender-based discrimination in the administration of [parental and family-care] leave benefits." *Hibbs*, 538 U. S., at 735. See also *id.,* at 729–731, and n. 5 (Congress adduced evidence "of a pattern of constitutional violations on the part of the States" in granting parental and family-care leave).

Requiring States to provide gender-neutral parental and family-care leave alone, Congress was warned, would promote precisely the type of workplace discrimination Congress sought to reduce. The "pervasive sex-role stereotype that caring for family members is women's work," *id.,* at 731, Congress heard, led employers to regard required parental and family-care leave as a woman's benefit. Carol Ball, speaking on behalf of the U. S. Chamber of Commerce, testified that she did not think "there are going to be many men that take up . . . parental leave." See Hearing on S. 345 before the Subcommittee on Children, Family, Drugs, and Alcoholism of the Senate Committee on Labor and Human Resources, 101st Cong., 1st Sess., 39 (1989) (statement of Carol Ball). She frankly admitted that she herself would choose to hire a man over an equally qualified woman if parental leave was required by law. *Id.,* at 30.

Others similarly testified that mandating gender-neutral parental leave would lead to discrimination against women. A representative of the National Federal of Independent Business stated: "Requiring employers to provide parental leave benefits creates clear pressures for subtle discrimination based on . . . sex. When choosing between two equally qualified candidates, an employer may be more likely to hire the candidate least likely to take the leave. It is the wage levels and jobs of women of childbearing years which are most at risk in such a situation." Hearing on H. R. 1 before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 103d Cong., 1st Sess., 95 (1993).

See also 1989 House Hearing 169 (statement of Cynthia Simpler, American Society for Personnel Administration) ("Since working women will be viewed as the most likely candidates for parental leave, hidden discrimination will occur if this bill becomes law. Women of child-bearing age will be viewed as risks, potentially disrupting operations through an untimely leave.").

Conversely—unlike perceptions surrounding who takes parental and family-care leave—Congress was told that men and women take medical leave approximately equally. According to one study, male workers missed an average of 4.9 days of work per year due to illness or injury; female workers missed 5.1 days. See 1991 House Report, pt. 1, p. 28. "[T]he incidence of serious medical conditions that would be covered by medical leave under the bill," Congress determined, "is virtually the same for men and women. Employers will find that women and men will take medical leave with equal frequency." *Ibid.* "[P]arental and medical leave," Congress was thus alerted, "are inseparable":

> "In the words of an old song, 'You can't have one without the other.'
>
> .          .          .          .          .
>
> "Adoption of parental leave protections without medical leave would . . . encourage discrimination against women of child-bearing age, who constitute approximately 73 percent of all the women in the labor force.
>
> "Employers would tend to hire men, who are much less likely to claim [the parental leave] benefit. . . .
>
> "Parental leave without medical leave would be the modern version of protective labor laws." 1986 House Hearing 33–34 (Statement of Irene Natividad, National Women's Political Caucus).

Congress therefore had good reason to conclude that the

self-care provision—which men no doubt would use— would counter employers' impressions that the FMLA would otherwise install female leave. Providing for self-care would thus reduce employers' corresponding incentive to discriminate against women in hiring and promotion. In other words, "[t]he availability of self-care leave to men serves to blunt the force of stereotypes of women as primary caregivers by increasing the odds that men and women will invoke the FMLA's leave provisions in near-equal numbers." See Brief for National Partnership for Women & Families et al. as *Amici Curiae* 26. As Judge Lipez explained:

> "If Congress had drawn a line at leave for caring for other family members, there is greater likelihood that the FMLA would have been perceived as further reason to avoid granting employment opportunities to women. Heretofore, women have provided most of the child and elder care, and legislation that focused on these duties could have had a deleterious impact because of the prevalent notion that women take more advantage of such leave policies. The inclusion of personal medical leave in the scheme, unrelated to any need to care for another person, undermines the assumption that women are the only ones taking leave because men, presumably, are as likely as women to get sick." *Laro* v. *New Hampshire*, 259 F. 3d 1, 21 (CA1 2001) (dissenting opinion).

Senator Barbara Boxer advanced a similar point. Responding to assertions that the FMLA would lead employers to discriminate against women, Senator Boxer stated: "[T]o say that women will not be hired by business is a specious argument . . . . Men also get sick. They get cancer. They get heart disease. They have ailments. And this bill applies to men and women." 139 Cong. Rec. 1697 (1993). See also 1987 Senate Hearings, pt. 2, p. 536 ("I

just think it's wrong that there will be a perception that this is something that only women will take and they are, therefore, more expensive. Both men and women have medical conditions . . . ." (statement of Prof. Susan Deller Ross, Georgetown University Law Center)).

The plurality therefore gets it wrong in concluding that "[o]nly supposition and conjecture support the contention that the self-care provision is necessary to make the family-care provisions effective." *Ante,* at 9. Self-care leave, I would hold, is a key part of Congress' endeavor to make it feasible for women to work and have families. See 1991 Senate Report 25–26 ("This legislation is essential if the nation is to address the dramatic changes that have occurred in the American workforce in recent years. . . . The once-typical American family, where the father worked for pay and the mother stayed at home with the children, is vanishing. . . . Today, more than one-half of all mothers with infants under one year of age work outside the home. That figure has doubled since 1970 . . . . By the year 2000, about three out of every four American children will have mothers in the workforce."). By reducing an employer's perceived incentive to avoid hiring women, §2612(a)(1)(D) lessens the risk that the FMLA as a whole would give rise to the very sex discrimination it was enacted to thwart. The plurality offers no legitimate ground to dilute the force of the Act.

### IV

Two additional points. First, this Court reached a different conclusion than the one I reach here in *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356 (2001), and *Kimel,* 528 U. S. 62. In those cases, as we observed in *Hibbs*, we reviewed statutes targeting disability and age discrimination, respectively. Neither disability nor age is a suspect classification under this Court's Equal Protection Clause jurisprudence; States may discriminate on the

basis of disability or age as long as the classification is rationally related to a legitimate state interest. See *Garrett*, 531 U. S., at 366–367; *Kimel*, 528 U. S., at 83–84. Therefore, for the statutes to be responsive to or designed to prevent unconstitutional discrimination, Congress needed to rely on a pattern of irrational state discrimination on the basis of disability or age. See *Garrett*, 531 U. S., at 368; *Kimel*, 528 U. S., at 89. Here, however, Congress homed in on gender discrimination, which triggers heightened review. See *United States* v. *Virginia*, 518 U. S. 515, 531 (1996) ("Parties who seek to defend gender-based government action must demonstrate an exceedingly persuasive justification for that action." (internal quotation marks omitted)). "[I]t was [therefore] easier for Congress to show a pattern of state constitutional violations." *Hibbs*, 538 U. S., at 736.

Finally, the plurality's opinion does not authorize state employers to violate the FMLA, although it does block injured employees from suing for monetary relief. The self-care provision remains valid Commerce Clause legislation, Maryland concedes, and consequently binds the states, as well as the private sector. Tr. of Oral Arg. 25; Brief for Respondents 32–33. An employee wrongly denied self-care leave, Maryland also acknowledges, may, pursuant to *Ex parte Young*, 209 U. S. 123 (1908), seek injunctive relief against the responsible state official. See Brief for Respondents 33. Moreover, the U. S. Department of Labor may bring an action against a state for violating the self-care provision and may recover monetary relief on an employee's behalf. 29 U. S. C. §§2617(b)(2)–(3), (d).

V

The plurality pays scant attention to the overarching aim of the FMLA: to make it feasible for women to work while sustaining family life. Over the course of eight years, Congress considered the problem of workplace

discrimination against women, and devised the FMLA to reduce sex-based inequalities in leave programs. Essential to its design, Congress assiduously avoided a legislative package that, overall, was or would be seen as geared to women only. Congress thereby reduced employers' incentives to prefer men over women, advanced women's economic opportunities, and laid the foundation for a more egalitarian relationship at home and at work. The self-care provision is a key part of that endeavor, and, in my view, a valid exercise of congressional power under §5 of the Fourteenth Amendment. I would therefore reverse the judgment of the U. S. Court of Appeals for the Fourth Circuit.